IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 9, 2013

**IN RE KAITLYN B. S. ET AL.**

**Appeal from the Juvenile Court for Bedford County**
**No. 3416      Charles Rich, Judge**

**No. M2013-00452-COA-R3-PT - Filed August 21, 2013**

The Bedford County Juvenile Court terminated the parental rights of the mother of two children on the grounds of failure to support, substantial noncompliance with the permanency plans, and persistence of conditions, and upon the determination that termination of mother's rights was in the best interests of the children. The father executed a voluntary surrender of parental rights to the children. Mother appeals. Finding the evidence clear and convincing, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, J.J., joined.

Emeterio R. Hernando, Lewisburg, Tennessee, for the appellant, Lettitia S.[1]

Robert E. Cooper, Jr., Attorney General and Reporter, Derek C. Jumper, Assistant Attorney General, Mary Byrd Ferrar, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

Trisha A. Bohlen, Shelbyville, Tennessee, for Kaitlyn B.S. and Mackenzie L.S.

**OPINION**

Lettitia S. ("Mother") is the mother of two minor children, Kaitlyn (born February 1999) and Mackenzie (born August 2000). The children came into protective custody of the Department of Children's Services ("the Department") on March 15, 2010, after the

---

[1]This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

Department received a referral from a teacher of one of the children and the subsequent investigation revealed that Mother, *inter alia*, had hit her child with a curling iron. The Department filed a Petition For Temporary Legal Custody and *Ex Parte* Order on March 18, 2010, in which it was alleged the children were dependent and neglected as a result of Mother's physical abuse, her inability to control the children, to provide for the children, and to ensure the children's medical and mental health needs were met appropriately. The petition was supported by the affidavit of Tammie Howell, Case Manager of the Bedford County Office of the Department, who had personally investigated the referral. A Protective Custody Order was approved by the juvenile court and entered on the same date.

A preliminary hearing was set for March 18, 2010. Mother waived her right to a preliminary hearing and the juvenile court found there was probable cause to believe that the children were dependent and neglected, and ordered that the children remain in the custody of the Department. On April 9, 2012, the children's father, Jackie S., who had not been residing with Mother or the children, executed a voluntary surrender of his parental rights to the children. Thus, the subsequent proceedings and this appeal only pertain to Mother's parental rights.

The Department developed the first of several permanency plans on April 7, 2010, identifying Mother's responsibilities and goals for her to regain custody of the children. The plans required Mother to, *inter alia*, provide suitable and stable housing for at least six months and provide proof of housing; obtain and maintain a legal source of income and provide proof of the income, whether from employment, disability, social security payments, Families First, or other State assistance; ensure the children were not exposed to violent situations; develop a routine schedule for the children; work with Omni Visions to learn ways to handle the children's behaviors; continue to attend mental health counseling and follow all recommendations; and develop, with the children's respective foster placements,[2] a list of rules, consequences and rewards for the children's behavior.

The children were placed in foster care. At first they both resided at Youth Villages, Harbour Campus in Georgia. After improvement in their mental health and medical conditions, they were transferred to separate foster homes due to their respective special needs. Mackenzie was moved to Youth Villages in Lewisburg, Tennessee. Kaitlyn was moved to reside in a therapeutic foster home with a family in Cookeville, Tennessee, where she remains. Thereafter, Mackenzie was relocated to reside with a family in Hohenwald, Tennessee, where she remains.

---

[2]Both children had substantial medical and mental health needs but to different degrees; thus, it was necessary that the children be assigned different foster placements.

In the interim, subsequent permanency plans, adopted in September 2010, March 2011, and May 2011, included requirements that Mother work with Youth Villages as a behavioral support for Mackenzie and Kaitlyn, pay child support as previously ordered by the court, communicate with the Shelbyville Housing Authority to obtain housing applications, obtain job applications, and effectively parent the children by developing the skills necessary to respond to their respective special needs. Throughout this period, the Department provided a variety of services to assist Mother in meeting her obligations under the permanency plans and remedying the conditions that resulted in foster care, which services will be addressed in detail later in this opinion.

As the months passed, the Department determined that Mother was not complying with the plans, and the conditions that existed when the children were taken into custody persisted. Accordingly, on January 9, 2012, the Department filed a Petition for Termination of Parental Rights on the grounds of abandonment for failure to visit and failure to support, substantial noncompliance with permanency plans, and persistence of conditions.

The petition to terminate Mother's parental rights was tried in the Juvenile Court of Bedford County on October 12, 2012, and January 11, 2013. The court heard testimony from numerous witnesses including Mother; Kellee Smith, a Department family service worker; James Brinkley, a social services employee with the Department; Brandi Hampshire, an employee with Youth Villages; Lindsey Wade, a CASA volunteer; Amy Hawkins, the foster care counselor for Mackenzie; and Jack B., the therapeutic care foster parent for Kaitlyn.

The juvenile court entered an order on January 22, 2013, finding the Department had proven three grounds by clear and convincing evidence: the grounds of abandonment due to failure to support, substantial noncompliance with the permanency plans, and persistence of conditions. The court also found termination of Mother's parental rights was in the best interests of the children. Accordingly, Mother's parental rights were terminated.

Mother filed a timely notice of appeal. She presents four issues for our review: whether the trial court erred in finding three grounds for termination of her parental rights under Tennessee Code Annotated § § 36-1-13(g)(1) - (g)(3) and whether termination of Mother's parental rights is in the best interests of the children.

## STANDARD OF REVIEW

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

-3-

Parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The petitioner has the burden of proving that there exists a statutory ground for termination, such as abandonment or failure to remedy persistent conditions that led to the removal of the child. *See* Tenn. Code Ann. § 36-1-113(c)(1); *Jones*, 92 S.W.3d at 838. Only one ground need be proved, so long as that ground is proved by clear and convincing evidence. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition to proving one of the grounds for termination, the petitioner must prove that termination of parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (no Tenn. R. App. P. 11 application filed) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810).

The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 548.

**ANALYSIS**

### I. PERMANENCY PLAN AND THE DEPARTMENT'S EFFORTS

This is not a case where reasonable efforts are excused,[3] therefore, we must first determine whether the terms and goals of the permanency plans were reasonable and related to remedying the conditions which necessitated removal of the children and whether the

---

[3]The Department is not required to make reasonable efforts every time it removes a child. In certain aggravated circumstances, such as severe child abuse, the Department is relieved of this duty. Tenn. Code Ann. § 37-1-166(g)(4); Tenn. Code Ann. § 36-1-113(g)(7).

Department exerted reasonable efforts to assist Mother to achieve the goals and to be reunited with her children before examining the grounds at issue.

"Because of the prominent role that the Department plays in the lives of so many dependent and neglected children, the Tennessee General Assembly has explicitly imposed on the Department the responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home." *In re Tiffany B.*, 228 S.W.3d 148, 157-58 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 37-1-166). The Department's first obligation in this regard is to establish permanency plans, the terms of which are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). This statutory policy does not require that the Department's effort to reunify the family be "herculean"; nevertheless, the Department's employees "must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006).

Reasonable efforts are statutorily defined as the "exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). In cases like this one, the factors that courts use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts. *In re Tiffany B.*, 228 S.W.3d at 158-59 (citing *In re Giorgianna H.*, 205 S.W.3d at 519).

Although the Department bears a heavy responsibility with regard to reunification, the road to reunification is a "two-way street." *State Dep't. of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006). Parents desiring to be reunited with their children "must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519. Accordingly, even though the Department bears a heavy responsibility to facilitate reunification, the Department does not bear the entire responsibility. *S.M.D.*, 200 S.W.3d at 198.

## A. PERMANENCY PLAN

The children were removed from Mother's custody due to concerns of Mother's physical abuse of the children, inability to control the children, inability to provide for the children, and inability to ensure the children's medical and mental health needs were met appropriately. The Department also learned that Mother had no source of income and was essentially homeless when the children were removed, in fact, Mother and the children had been banned from one homeless shelter and a motel, and she was paying for somewhere to stay on a day-to-day basis. Because of the above concerns, the Department developed permanency plans with goals to ensure the children's safety and that they were not exposed to violent behavior, develop a routine schedule for Mother and the children, learn ways to handle the children's behaviors, and develop a list of rules, consequences, and rewards for the children's behavior. The plan also provided means to help Mother obtain suitable and stable housing and a source of income by employment or benefits.

We have concluded that the above requirements and goals identified in the permanency plans were reasonable and related to remedying the conditions which necessitated the removal of the children from Mother's care and the resulting foster care placement. Accordingly, the plans satisfied the requisite criteria. *See In re Valentine*, 79 S.W.3d at 547; *see also* Tenn. Code Ann. § 37-2-403(a)(2)(C).

## B. REASONABLE EFFORTS

As for the Department's efforts to help Mother achieve the above goals, the Department attempted to assist Mother with her mental health requirements, which was an underlying issue that affected many of her deficiencies, by arranging and paying for a series of mental health therapy sessions at Centerstone. The Department also arranged and paid for classes at Centerstone to improve Mother's parenting skills.

James Brinkley and Kellee Smith testified on behalf of the Department about the services provided to Mother to assist her to find employment and obtain benefits. Mr. Brinkley testified that he called an employer on Mother's behalf and that he advised her about applying for disability. He also acquired employment applications for Mother.

Ms. Smith stated that Mother was also given a resource guide notebook for Bedford County and twelve surrounding counties that contained phone numbers and addresses for crisis care, dental assistance, clothing help, daycare assistance, disability, education and careers, financial help, food assistance, family counseling, housing, medical assistance, mental health programs, legal services, prescription and transportation assistance, and support groups in abuse help.

As for the children's needs, the Department provided both of the children with additional services to address their special needs, including emotional and mental health needs. After Mackenzie completed Level III and Kaitlyn completed Level IV residential care at Harbour Campus in Georgia, which was deemed necessary to address their respective emotional and mental health needs, the children were assigned foster care placements in Tennessee, to address their long term needs, where they remain.

Considering the above facts and other relevant evidence we have not yet addressed, we have determined the Department exerted reasonable efforts to assist Mother to achieve the stated goals.

We now turn our attention to the statutory grounds at issue: abandonment by failure to support the children, substantial noncompliance with the permanency plans, and persistence of conditions, to determine whether the evidence clearly and convincingly establishes one or more of these grounds.

## II. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

### A. ABANDONMENT BY FAILURE TO SUPPORT

To find abandonment by failure to support, it must be established that the failure to support was "willful." *In re R.L.F.*, 278 S.W.3d 305, 320 (Tenn. Ct. App. 2008). Failure to pay support is "willful" if the parent "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *In Re J.J.C.*, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004) (quoting *In re Adoption of Muir*, No. M2002–02963–COA–R3–CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003)). The fact the parent was not under an order to pay support is not dispositive of the question of whether the failure is willful; the obligation to pay support exists in the absence of a specific order. *Tenn. Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 524 (Tenn. Ct. App. 2004).

For purposes of terminating parental rights of a parent, "abandonment" means:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s)

either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).

In February 2011, Mother was ordered to pay $358 per month in child support. Mother admitted knowing that she was under a court order to pay support and she admitted that she made no payments after the entry of the order in February 2011 until September 2011, when Mother remitted one payment of $100 for child support. No other payments were made prior to the filing of the Petition to Terminate Parental Rights on January 9, 2012.

Mother testified that she failed to make the support payments because she was unable to work due to a disability resulting from a car accident in 1997, she was unable to obtain employment because of her age, and that she was relying on her paramour for everything that she needed including housing. The trial court, however, found Mother's testimony inconsistent for several reasons because Mother admitted that she worked for eight years after the 1997 accident and that she did not stop working until 2005. As noted earlier, James Brinkley and Kellee Smith provided assistance to help Mother find employment and obtain benefits. Mr. Brinkley advised her about applying for disability and he acquired employment applications for Mother, but to his knowledge she never applied for a job. He additionally offered her his office to work from, he offered her internet access, and rides to pick up applications and drop them off, but she never took him up on those offers. Ms. Smith stated that on several occasions, she provided Mother with information about possible jobs in addition to the possibility of vocational rehabilitation and/or filing for disability and, to her knowledge, Mother never followed up with any of these opportunities.

Considering the foregoing and the entire record, it has been clearly and convincingly established that Mother was aware of her duty to support the children, that she had the ability to provide support, and that she wilfully failed to do so. Therefore, we affirm the finding that Mother abandoned the children by failing to support them.

B. SUBSTANTIAL NONCOMPLIANCE WITH THE PERMANENCY PLANS

Tennessee Code Annotated § 36–1–113(g)(2) authorizes termination of parental rights for failure to comply with a parenting plan. In order for noncompliance to justify the termination of parental rights, it must be "substantial." *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008). In conjunction with terminating a parent's rights on the ground of substantial noncompliance, the trial court must find that the requirements of the permanency plan that the parent allegedly did not satisfy are "reasonable and related to remedying the conditions which necessitate foster care

placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37–2–403(a)(2)(C)). The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed de novo with no presumption of correctness. *Id.* at 546.

The first permanency plan was adopted on April 7, 2010. Pursuant to the first and subsequent plans, the goals of which remained consistent, Mother was to obtain suitable and stable housing, a source of income, work with Omni Visions and the children's placement contacts to learn ways to handle the children's behaviors, continue attending mental health counseling, and develop the skills necessary to respond to Mackenzie and Kaitlyn's special needs. She accomplished none of these goals.

Ms. Smith testified that Mother was living with her boyfriend, an arrangement that did not meet the requirement that she obtain suitable and stable housing. Ms. Smith stated that she had not seen any improvement in the children's relationship with Mother, nor did she see any improvement in Mother's ability to care for the children. Ms. Smith also stated that she did not believe Mother would ever improve or satisfy any of the goals.

Mother acknowledged the Department tried to help with her medical condition and admitted she had not complied with the requirement of the permanency plans to attend mental health counseling. Mother stopped attending her therapy sessions and stopped taking her prescribed medications, stating at trial: "I don't feel like I need all that medicine." She admitted that she was living with her boyfriend and had been for approximately the last two years and that he had no experience living with the children; in fact, she stated he had only met the children once during a court appearance. Mother admitted that if she were to provide anything for her children, her boyfriend would have to do it. When asked what she would do if he forced her to leave his home, Mother said she assumed by then she would be drawing disability. When asked if she could physically care for her children if they were returned to her custody, Mother said that although her back keeps her immobile most of the day, she felt confident she would be able to take care of her children. When asked if her children were returned to her how would she address their mental health needs, she responded by saying her mother would help with that.

Mr. Brinkley and Ms. Hampshire both testified that the children did not interact well with Mother during her visits and that, on at least one occasion, Kaitlyn refused to even talk to her mother or sit at the same table, nor did she say goodbye at the end of the visit. Although the Department arranged parenting skills classes at Centerstone, Mother never attended the sessions. Moreover, Mother blames Kaitlyn for the children being in the Department's custody, and when Ms. Hampshire tried to explain Kaitlyn's position, Mother

became angry and frustrated. In Ms. Hampshire's opinion, Mother's parenting skills had not improved, and in fact had gotten worse.

Lindsey Wade, a CASA volunteer, worked with Mother and the children since they came into the Department's custody and issued a report on April 2, 2012, stating that Mother's work towards the goals of the permanency plan of counseling, finding a permanent residence, and finding employment, had been "sporadic at best." Although the children had been in the Department's custody for two years, Ms. Wade stated that Mother had made no significant progress toward achieving the goals of the permanency plan.

As for the Department's efforts to help Mother achieve the above goals, the Department attempted to assist Mother with her mental health requirements, which was an underlying issue that affected many of her deficiencies, but, according to Ms. Smith, Mother seldom attended her mental health therapy sessions at Centerstone, and repeatedly cancelled appointments or merely failed to attend. She attended only four and half hours of counseling at Centerstone from April 2010 through September 2012, and provided no valid reason why she refused to attend her sessions on a regular basis. Mother refused to take prescribed medication to address her mental health issues. The Department also arranged classes at Centerstone to improve Mother's parenting skills but she never attended these sessions.

The foregoing, and other evidence in the record, established by clear and convincing evidence that Mother was in substantial noncompliance with the permanency plan. Therefore, we affirm the trial court's finding that Mother failed to substantially comply with the requirements of the permanency plan.

C. PERSISTENCE OF CONDITIONS

Tennessee Code Annotated § 36-1-113(g)(3) specifies the essential elements for the "persistent conditions" ground for termination of parental rights. It provides that grounds for termination exist when:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (A)  The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) . . . , still persist;
> > (B)  There is little likelihood that these conditions will be

-10-

remedied at an early date so that the child can be safely returned to the parent(s) . . . in the near future; and

(C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . .

*Id.*

The evidence in this record, which we summarized earlier in this opinion, clearly and convincingly established that Mother made no material changes to the conditions that existed when the children were removed in 2010, that there is little likelihood that these conditions will be remedied at an early date so that the children may be safely returned to Mother in the near future, and that the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home. For these reasons, we affirm the trial court's finding that the Department proved the "persistent conditions" ground for termination of Mother's parental rights by clear and convincing evidence, pursuant to Tennessee Code Annotated § 36-1-113(g)(3).

## II. BEST INTEREST OF THE CHILD

The Tennessee General Assembly has provided a list of factors for the court to consider when conducting a best interest of the child analysis. *See* Tenn. Code Ann. § 36-1-113(i)(1)-(9). The nine statutory factors, which are well known and need not be repeated here, are not exclusive or exhaustive, and other factors may be considered by the court. *See In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Moreover, not every statutory factor need apply; a finding of but a few significant factors may be sufficient to justify a finding that termination of the parent child relationship is in the child's best interest. *See In re M.A.R.*, 183 S.W.3d at 667. The child's best interest is to be determined from the perspective of the child rather than the parent. *See State Dep't of Children's Servs. v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *7 (Tenn. Ct. App. Dec. 3, 2007) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

Lindsey Wade, the CASA volunteer who had worked with the children since they came into the Department's custody, testified they were doing "world's better." She also stated that Mackenzie expressed to her that she would like to be adopted by her current family, and the foster parents wished to adopt her. She said that Kaitlyn, who still needs help, wants to be adopted and that Kaitlyn "was so adamant about it, that she wanted to write a letter to make sure that she didn't have to visit with her mother anymore." Unfortunately, Kaitlyn's foster family is a therapeutic foster family, they are not an adoptive family, and therefore, the are not in a position to consider adoption.

Jack B., Kaitlyn's therapeutic foster parent, testified that when Kaitlyn first entered his home she exhibited all types of extreme behavior, including: speaking in a demonic voice, being defiant at almost every action, adopting a head-down position, demonstrating feral eating habits, including eating with both hands, throwing and hitting things, and regularly occurring outbursts that would last four or five hours at a time. She was on seven different medications when she arrived but she is now only on two medications. Her behaviors, he stated, have improved, and most of her present needs are believed to be connected to her foundational diagnosis of autism. He also stated that Kaitlyn had improved immensely in her ability to attend school without incident.

Ms. Wade recommended that Mother's parental rights be terminated because the children had been in custody for two years, and no significant progress had been made towards the goals of the permanency plan.

Brandi Hampshire, an employee of Youth Villages, testified that Kaitlyn wants to be adopted and does not want to go back to her mother. Ms. Hampshire also testified that Kaitlyn's "afraid that she will be abused by her mother if she's returned."

In this case, the evidence clearly and convincingly established that Mother failed to make an adjustment in circumstance to provide a safe and stable home for the children. *See* Tenn. Code Ann. § 36-1-113(i)(1). Further, to allow the children to return to Mother, which could not be considered until she makes many positive changes and becomes a responsible parent, which Mother has repeatedly failed to do, would subject the children to more uncertainty and instability. Moreover, it would require the removal of the children from environments where their conditions have dramatically improved and they are much happier and healthier. *Id.* § 36-1-113(i)(5).

Considering these relevant factors from the children's perspective, the evidence clearly and convincingly established that it is in the children's best interests that Mother's parental rights be terminated.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed to Mother.

_____
FRANK G. CLEMENT, JR., JUDGE